## CITY OF BANGOR
### *vs.*
## PUBLIC UTILITIES COMMISSION ET AL.

Kennebec.    Opinion, November 11, 1960.

*Horace A. Hildreth, Jr.,*
*Vincent L. McKusick,* for plaintiff.

*Peter N. Kyros,*
*John E. Harrington,* for Bangor Water District,
of Bangor

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

SIDDALL, J. This case comes before us on exceptions by the City of Bangor, hereafter called the City, to the allowance and approval by the Public Utilities Commission, hereafter called the Commission, of a schedule of water rates filed by the Bangor Water District, hereafter called the District.

The District was incorporated under the provisions of Chapter 39 of the Private and Special Laws of Maine, 1957. At the time of the incorporation of the District, the source of water for public use in the City was the Penobscot River, and this water was of poor quality for drinking purposes. Among the purposes for which the District was organized was that of supplying the inhabitants of the District "with pure water for fire prevention and protection purposes, and also for domestic, sanitary, commercial, industrial, and other lawful purposes." The territorial boundaries of the District were the same as those of the City. The property of the District was tax exempt.

A new source of water supply, located about fifteen miles from Bangor, was decided upon by the District and a 30-inch transmission main was constructed to convey the new water to the Penobscot River, and two 24-inch mains were constructed to carry it beneath the river to the city.

The cost of constructing the new system necessitated an increase in annual revenue. The District filed a proposed

rate schedule designed to increase its annual revenue from $263,270.86 to $483,981.14. The proposed rate schedule was allowed and approved by the Commission. Exceptions were duly filed by the City.

The reasonableness of the total amount of the increase in revenue claimed by the District and allowed by the Commission is not questioned. However, the allocation of that total amount between the City and the other water users is questioned.

The contentions of the City, as argued in its brief, are summarized as follows:

1. That the allocation to public fire protection made by the Commission's decree is unjust, unreasonable, or discriminatory in "end result."

2. That the Commission purported to adopt the Wisconsin Method of making the allocation between general water users and public fire protection and that the Commission erred in refusing to admit or consider evidence with respect to the "tax equivalent" in applying that method.

3. That the Commission failed and refused to give any weight or consideration to the circumstance that 48% of all real property in the City of Bangor is tax exempt.

4. That the Commission erred (either because it misapplied the Wisconsin Method or violated general principles of law) in failing and refusing to give any weight in its allocation to the fact that the revenue increase was necessitated by expenditures incurred for the purpose of improving the quality of drinking water, and not for any purpose connected with public fire protection.

The Commission contends that the ultimate issue in this case is whether the rates set were just and reasonable, the

answer to which depends upon the determination of the question of whether or not the Commission has properly apportioned or allocated costs between public fire protection and general service use. The Commission asserts that the questions before the court are questions of fact and not of law.

R. S., 1954, Chap. 44, Sec. 17, provides that the rates or charges collected by any public utility for water must be just and reasonable. Section 39 of the same chapter provides that "if any public utility makes or gives any undue or unreasonable preference or advantage to any particular person, firm, or corporation or any undue or unreasonable prejudice or disadvantage in any respect whatever, such public utility shall be deemed guilty of unjust discrimination which is prohibited and declared unlawful." Furthermore, the rates must not be confiscatory in violation of the due process clauses of the Constitution of the United States and of the State of Maine. *Central Maine Power Company* v. *Public Utilities Commission,* 153 Me. 228, 230, 136 A. (2nd) 726.

The burden of proof is upon the party seeking to set aside any direction or order of the Commission complained of as unreasonable, unjust, or unlawful. R. S., 1954, Chap. 44, Sec. 71.

Questions of law only are presented by exceptions to a decree of the Public Utilities Commission. Determination of questions of fact is the sole province of the Commission. These principles are well set forth in *Central Maine Power Co.* v. *Public Utilities Commission, supra,* in the following language:

"There are certain fundamental principles to be kept in mind in passing upon exceptions to a decree of the Public Utilities Commission. (1) Questions of law, and only questions of law, are pre-

sented by exceptions. R.S. Chap. 44, Sec. 67. (2) The facts are found by the Commission and not by the Court. (3) The burden is upon the complaining party, here the Company, to establish the error of law. (4) Errors of law are committed if the Commission: (a) erroneously interprets and applies by its ultimate ruling the law applicable to the facts found by it, or, (b) in its findings of fact, which form the basis of such ultimate ruling, misinterprets the evidence, or, (c) makes such findings of fact unsupported by substantial evidence. (5) Further, the rates must not be confiscatory in violation of the due process clauses of the State and Federal Constitutions. State, Art. I, Sec. 19; Federal, 14th Amendment."

In *New England Tel. & Tel. Co.* v. *Public Utilities Comm.*, 148 Me. 374, 377, 94 A. (2nd) 801, in discussing the same principles our court said:

"The Commission is the judge of the facts in rate cases such as this. This court under the statute which created it is only a court to decide questions of law. It must be so, for it has not at its disposal the engineering and the technical skill to decide questions of fact which were wisely left within the province of the Commission. Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene. Then the question becomes one of law. We cannot review the Commission's findings of fact and seek to determine what rates are reasonable and just. When the Commission decides a case before it without evidence, or on inadmissible evidence, or improperly interprets the evidence before it, then the question becomes one of law."

If a factual finding, as a basis for an order of the Commission, is supported by any substantial evidence, the finding is final. *Public Utilities Commission* v. *Johnson Motor*

*Transport,* 147 Me. 138, 143, 84 A. (2nd) 142, and cases cited therein. Substantial evidence is such evidence as taken alone would justify the inference of the fact. *Gilman* v. *Telephone Company,* 129 Me. 243, 248, 151 A. 440.

For many years the problem of allocating the revenues of a public utility between fire protection service and general customer service has been a most perplexing one. Obviously, a correct mathematical result cannot be attained. In *Central Maine Power Company Re Contract Rate,* 152 Me. 32, 37, 122 A. (2nd) 541, the court said:

> "When there is a general rate increase, and from such an increase the parties cannot here escape, there must of necessity be left for the judgment of the Commission a wide area of adjustment of rates in various classifications within the business of the utility. If the Commission with its accumulated experience and with the resources available to it cannot fairly adjust rates, to whom is this task to be entrusted? It is well understood that we do not make rates. Our function as a Law Court in considering exceptions to decrees of the Public Utilities Commission is to guard against violations of the Constitution and the law."

At one time the Public Utilities Commission applied a policy of apportioning from 28% to 32% of the gross revenue of a water company to public service. Re: *Biddeford & Saco Water Co.,* F. C. 1481 (Me. P. U. C. 1956). The Commission in that case said:

> "Our investigation satisfies us that of the gross annual revenue which a water company must receive if it renders both public and domestic service, the public service should pay an amount between 28% and 32% thereof. If those who use the public service pay less than 28% of this necessary annual gross revenue, other users of the service of the company must pay an amount disproportionate to the value of the service which they are receiving."

It is well recognized, however, that the proportionate costs of fire protection decreases with an increase in the size of a community and the consequent larger number of private users.

With these preliminary observations we discuss the contention that the Commission failed to give any weight to the fact that the revenue increase was necessitated by expenditures incurred for the purpose of improving drinking water, and not for any purpose connected with public fire protection.

Both parties refer in their briefs to an article written by Robert Nixon, Commissioner, Public Service Commission, Madison, entitled "Charges for Fire Protection Service as Determined by The Public Service Commission of Wisconsin" and published in the Journal of the American Water Works Association, Vol. 29, No. 12, December, 1937. In this article Mr. Nixon, in discussing the difficult task of dividing the cost of water service between general use and fire protection service, has this to say:

> "It is generally recognized that water utilities furnish two major classes of service: water for general use in homes, stores, and shops; and fire protection service. Because the same property is jointly used to furnish these two major services, the task of dividing the total cost of service between these two major uses has always been a perplexing one.
>
> * * * * * * * * * * *
>
> It appears advisable first to define what is meant by fire protection service. As we understand it, this service classification embraces what a water utility furnishes a city and its property owners by having a reliable source of water supply, pumping equipment, storage facilities, transmission and distribution mains, with hydrants attached thereto, adequate to supply the fire-fighting apparatus of

the city with all the water it requires at any time even under conditions of maximum draught or demand by general service customers. Keeping ready to supply water under adequate pressure is a more important feature in this service than the actual amount of water used. Essentially, therefore, the charge for fire protection service is primarily a stand-by or readiness-to-serve charge. The charge should be sufficient to cover what are primarily capacity costs, rather than costs of the water itself.

\* \* \* \* \* \* \* \* \* \* \* \*

This is mentioned because of a tendency on the part of some people to adopt a theory that general water service should be considered as of more importance than fire protection service and that therefore charges for fire protection service should be determined upon what is called an additional cost or additional business basis. The Commission has not taken this view. From the various analyses of the investment and operating costs of water utilities and especially from reports of the National Board of Fire Underwriters, it appears that there would be just as much, if not more, reason and justice in doing exactly the opposite, namely, treating general service on the additional cost basis. As a matter of fact, however, the method developed by the Commission over a long period of years has been based upon the idea of dividing the joint investment and joint costs of water service on some fair and equitable basis.

The method used by the Commission can be briefly described as a cost analysis. This analysis can be broken down into steps described as follows: First, a separation of the used and useful property which can be said to have been built or installed for the purpose of being able to supply water at any time for fire protection service. Second, a determination of the maximum demands which each major class of service makes on the utility. Third, an estimate of the water used in fighting fires (usually a very small proportion of the total pumpage) plus a por-

tion of the lost and unaccounted for water, since part of this is due to holding water in the system under pressure available for fire protection use. Fourth, a separation of the detailed operating expenses plus allowances for fixed charges such as depreciation, taxes, and interest or return between the major classes of service.

In making a separation of the portion of jointly used property assignable to fire protection service the first task is to cull out from the used and useful property the investment in those items, such as meters and filtration plant equipment, which are wholly used in general service. Similarly, a separate listing should be made of the items of property wholly used for fire protection service, such as hydrants and their connections and fittings. What is left in the form of pumping equipment, reservoirs or standpipes and mains is jointly used property. In analyzing this jointly used property to arrive at a fair proportion assignable to fire protection service it is necessary to take the second step listed above, namely, determine the maximum demands which each major class of service makes on the utility. This is necessary because the bulk of the costs of fire protection service are in the nature of capacity costs.

* * * * * * * * * * *

It does not appear to be sound reasoning to say that because the pumps operate at the same rate irrespective of any fire demands that there is no investment in pumping equipment chargeable to this branch of the service.

One of the perplexing problems in determining a fair share of the investment in pumping equipment assignable to fire protection service is the treatment of surplus pumping capacity. Similar difficulties are met in connection with surplus main capacity. In order to supply either fire protection or general service every water department must of necessity supply a certain surplus capacity of both equipment and mains at large expense in order to

meet any emergency liable to arise at any time, day or night, as well as to provide for growth. If the water supply in the mains fails for a few hours, general consumers could still exist, but if it fails at time of fire, irremediable disaster and destruction of property might result. With these considerations in mind it seems only fair that the cost of providing reserve pumping capacity and mains should be shared between general water users and fire protection service.

\* \* \* \* \* \* \* \* \* \* \*

Making an estimate of the amount of water used in fighting fires plus a portion of the lost and unaccounted for water, which is the third step in our method of analysis, is useful in estimating the amount of output expense assignable to fire protection service. Once such figures are determined those who take a limited view of the service furnished by a water utility may be inclined to say that because such a small proportion of the water is used for putting out fires that therefore a small proportion of the total costs of service are assignable to fire protection. That this is a limited and erroneous view should be apparent from what I have said previously. Let me reiterate that fire protection service is largely a stand-by service, the costs of which are principally the costs of providing capacity and holding it in readiness to furnish water at any time a fire breaks out.

The fourth step in our method of analysis is to split the operating expenses, plus allowances for fixed charges, between the two major classes of service supplied. Here, as in the case of the analysis of the property accounts, the initial step is to list first those expenses entirely associated with furnishing general service such as maintenance of meters and services, meter reading and collecting and, second, those expenses entirely associated with fire protection service such as hydrant inspection and maintenance. The remaining operating expenses are classifiable as joint and in

our method of analysis are classified first between capacity expenses and output expenses on the basis of several factors as appropriate to each kind of expense (see Appendix). The capacity expenses are then split between fire protection and general service in the ratio of maximum fire demand to total demand on the system including fire demand. The output expenses are then split between the two major classes of service according to the estimated amount of water used, including losses, in the two services.

The fixed charges of depreciation, taxes, and interest are ordinarily split between general service and fire protection service on the basis of the division of the investment in physical property assigned to each class of service. This division of investment was determined in the first step of the analysis.

* * * * * * * * * * *

It is regrettable but unavoidable that the determination of fire protection charges often involves sharp conflicts of interest between city officials, taxpayers, and water users. Even Solomon, with his proverbial wisdom, might be hard pressed to find an amicable and reasonable solution of some of these problems. The Commission, without the talents of a Solomon, has hitched its wagon to the twin principles:

(1) Consider each case on its merits

(2) Determine fire protection costs by a method of analysis flexible enough to take into consideration peculiar local circumstances

In brief, we believe that cost analyses, not more rule-of-thumb guesses, are the best bases for fair fire protection charges."

The evidence discloses that the maximum fire service demand of the City as determined by the National Board of Fire Underwriters was 5,500 gallons per minute, and the

maximum pumping demand for general service was 4,236 gallons per minute. The estimated actual use or output of water for fire protection, however, constituted but a small percentage of the water estimated to be used for all purposes. In allocating the revenue requirements, the District and the City reached widely different results. This situation arose mainly because the City considered the new system was developed for the purpose of bringing improved drinking water into the City and did not contribute to improved fire protection. The City, therefore, allocated the new facility on the basis of estimated water use or output. The District claimed the new facility should be chargeable to fire protection and general users on a capacity basis. The theory of the City in its allocation resulted in charging against the general customers most of the expenses relating to the new source of supply.

Prior to the formation of the District the water taken from the Penobscot River was suitable and sufficient for fire fighting purposes. The Charter of the District, authorized by the Legislature and accepted by the voters of the City, not only contemplated the discontinuance of the use of water from the Penobscot River after the new supply became available but required the discontinuance of such use. In planning the new system provision for fire protection was necessary. The operation of two separate systems was not practicable, nor was such a separation contemplated by the Legislature. The transmission lines of the new system were designed to carry an adequate water supply for fire protection service as well as for general service, and upon completion of the system the use of water from the Penobscot River was abandoned. Under these circumstances the Commission in adopting the allocation of revenues as proposed by the District, gave proper consideration to the purposes for which the water was used in accordance with the Wisconsin Method and with sound principles of law.

The City, in its brief, on this issue, cited numerous cases involving the extension of services of public utilities in which the cost of such extension was charged to those customers who benefited from the extension. We do not consider these cases analogous to the facts in the instant case.

The City claims that the Commission erred in failing to take into consideration the tax exempt property in the City of Bangor.

The evidence indicates that a sizable percentage of all the real estate in the City of Bangor is tax exempt, due primarily to the location of military bases in the city. The Commission in approving the rate schedule of the District allocating the revenue between public fire protection and general water specifically ruled against the City in its contention that the fact that the City had a large proportion of tax exempt property should be given consideration in the determination of a reasonable allocation of rates.

The City quotes from *South Berwick Water Co., Inc.* v. *Itself*, 24 P. U. C. (N. S.) 409, as follows:

> "In setting up a charge for fire protection service, for the present at least, some consideration must be given to the financial condition of the community served, their tax rate, whether or not they are prosperous or in distress."

Assuming, without deciding, that this is a correct statement of the law, there was no evidence in the case that the City was other than prosperous and financially sound. No claim was made that the tax rate was abnormally high. Our Legislature has seen fit to exempt certain property from taxation. If a problem is presented thereby, it is a problem common to most communities. The effect of the existence of exempt property upon the economic life of a community differs under different circumstances. It could well be that in many communities the location of tax exempt property

therein is an important factor in bringing economic prosperity to such community and an aid in enhancing the value of other property therein.

No case which substantiates the position of the City in respect to tax exempt property has been called to our attention. We are unable to discover any reasonable theory for considering such property in the allocation of water rates between fire protection and general service. We therefore find that the Commission was not in error in failing to take tax exempt property into consideration in determining the allocation of rates in this case.

The City contends that the Commission adopted the Wisconsin Method and erred in refusing to include in its computation a "tax equivalent" which it claims is a basic and necessary component of the Wisconsin Method.

The Wisconsin Method is described as a cost analysis method in Mr. Nixon's article herein referred to, and is broken down and based upon the following steps:

> "First, a separation of the used and useful property which can be said to have been built or installed for the purpose of being able to supply water at any time for fire protection service. Second, a determination of the maximum demands which each major class of service makes on the utility. Third, an estimate of the water used in fighting fires (usually a very small proportion of the total pumpage) plus a portion of the lost and unaccounted for water, since part of this is due to holding water in the system under pressure available for fire protection use. Fourth, a separation of the detailed operating expenses plus allowances for fixed charges such as depreciation, taxes, and interest or return between the major classes of service."

In its reference to the Wisconsin Method the Commission said:

"The Wisconsin Method of allocation is not new to this Commission, nor is it the sole method by which revenues may be apportioned; however, in our opinion it does have merit and can be used as a guide for determination of reasonable and just charges for Fire Protection Service. It is here noted that the District's allocation by this method results in a charge amounting to 23.02% of the required revenue being obtained from Fire Protection Service, whereas, the proposed rates as filed comprehend receiving only 20% of the revenues from this source."

In applying the use of the "tax equivalent" the City presented evidence, over objection, designed to show that the value of the tax exempt property of the district for the purpose of taxation, if taxed, would have been over two million dollars, and would have yielded a tax of $62,509. This sum, the City claims, should be treated as an expense of the District, a portion thereof allocated to general service and a portion to fire protection services. After the total expenses have been allocated between general service and fire protection, the City claims that the amount of the assumed tax, "the tax equivalent," should be credited against the gross amount allocated for fire protection service. The attached table illustrates the City's version of the application of the "tax equivalent."

The Commission in its decree considered that the proposal of the City to reflect the "tax equivalent" was a modification of the "Wisconsin Method" and ruled that the basic theory of allocation was that of relative demands, and concluded that the apportionment of revenues as proposed by the District, which did not take into consideration the "tax equivalent," was reasonable. In its findings the Commission specifically stated that any finding as to the reasonableness of allocation of rates for public fire protection must be predicated upon the fact that the District is a tax exempt entity. It thereby refused to consider the claim of the City in re-

gard to the "tax equivalent," and excluded all testimony and evidence relating thereto.

The Commission in Wisconsin for many years has included the "tax equivalent" in allocating charges by a municipally owned utility. In 1937 the Legislature included among the valid expenses of a municipally owned utility, which is tax exempt, local and school tax equivalents. Also, in Wisconsin a municipally owned water utility, contrary to the Charter of the District in this case, is permitted a fair return to its rate base. *Pabst Corporation et al.* v. *Railroad Commission, et al.*, 227 N. W. 18. See also *Village of Fox Point* v. *Public Service Commission*, 242 Wis. 97, 7 N. W. (2nd) 571.

> "The Wisconsin commission has ruled that municipalities operating public utilities may charge rates high enough to yield profit. Re Fennimore (1915; Wis.) P.U.R.1916A, 848 (electric and water plant) ; Skogmo v. River Falls (1917; Wis.) P.U.R. 1917E, 964 (electric and water plant) ; Re Kenosha (1918; Wis.) P.U.R.1918D, 751; and Re Milwaukee (1926; Wis.) P.U.R.1927B, 229 (both water plants)." Annotation 90 A. L. R. 703.

We have no history in this state of the inclusion of a tax equivalent by the Public Utilities Commission in allocating water rates. It is apparent that some factors which may be considered by the Wisconsin Commission do not apply in this jurisdiction. Under the Charter (Sec. 10), rates subject to approval of the Public Utilities Commission may be established to provide revenue for the following purposes only:

1) to pay current operation and maintenance expenses

2) to provide for the payment of interest on indebtedness of the District

3)  to provide annually not less than 1% nor more than 5% of the entire indebtedness as a sinking fund for the extinguishment of said indebtedness

Under Section 9 of the Charter the property of the district is exempt from taxation. The point in issue is not whether the district may raise revenue for payment of taxes. It is whether the rates may be allocated by adding the equivalent of a tax to the rates of the customers other than the municipality with a corresponding reduction in the charges to the municipality.

The City contends, however, that the Commission adopted the Wisconsin Method of allocation, and having done so, the failure to include a "tax equivalent," which it claims is a basic component of the Wisconsin Method, was error.

In support of its position the City quotes the case of *Mississippi River Fuel Corp.* v. *Federal Power Commission,* 163 F. (2nd) 443, 449 (3d Cir. 1947) as follows:

"That the Commission might have adopted some other method or formula for determining the costs of the regulated business is beside the point. In so far as it purported to adopt the demand-commodity formula, our review must be upon that basis. The Commission cannot announce the applicability of a formula and then distort its application by failure to find accurately the factors required by the formula, or by departing from the essential progress of the formula from premise to conclusion. When the Commission announces principles or formulae as applicable, the validity of its order can be determined only by measuring what it does against the principles it announces."

In the same case following the above quotation we find the following statement:

"This is so not only upon the authority of *Securities Comm'n v. Chenery Corp.,* but because any other

course would permit an administrative agency to announce a proper principle and, under that protection, achieve an improper result *by unrevealed considerations* wholly apart from the announcement. The prescribed judicial review would be set wholly at naught by any such procedure. In so far as the Commission purported to act upon its own informed judgment, apart from formulae or general principles, *its findings and reasons must be clearly and completely shown."* (Emphasis ours.)

The City, in its brief, cited the case of *City of Newport* v. *Newport Elec. Div.,* 116 Vt. 103, 70 A. (2nd) 590, 592 (1950) as bearing on the duty of the Commission to disclose the method employed to reach the prescribed rates. In that case we find the following pertinent statement by the court:

"The State cites *Federal Power Co. v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S. Ct. 281, 88 L.Ed. 333, in support of its statement that the result reached and not the method employed should control in determining what is a just and reasonable rate. But as pointed out in *Petition of New England Tel. & Tel. Co.,* 115 Vt. 494 at page 502, 66 A.2d 135, although this case held that a commission was not bound to the use of any single formula or combination of formulae in determining rates it is not thereby relieved from the duty *to disclose the 'method employed' to reach the prescribed rates,* so that the validity of its conclusions may be tested by judicial review. In the Hope case the company contended that it should be allowed a return of not less than 8%. The commission found that an 8% return would be unreasonable but that 6½% was a fair rate of return. The commission set forth many and various reasons on which it based its conclusions as to a fair rate of return. The Supreme Court held that in view of these stated reasons, it could not say that the annual return to the company which would produce 6½% on its rate base was not just and reasonable. Thus it is seen

that in the Hope case the commission *fully disclosed the method it used* in determining a just and reasonable rate of return. In the present case no such method is disclosed, nor could it well be without evidence on which to base it." (Emphasis ours.)

Our statutes do not provide for any particular formula or formulas for allocating revenue between different classes of services in cases of this nature, and the Commission is not bound by law to follow any specific formula or formulas. The Commission has the duty to disclose the method employed to reach the prescribed rates so that the validity of its conclusions may be tested on review. This disclosure was made by the Commission. In doing so, isofar as its consideration of the "tax equivalent" was concerned, it set forth in clear language its refusal to consider the "tax equivalent," and gave its reasons therefor. Under such circumstances it becomes immaterial whether the so called tax equivalent is a component part of the Wisconsin Method as claimed by the City, or is a modification of that method as claimed by the District. It was not a part of the method of allocation approved by the Commission, and the refusal of the Commission to consider it was not in itself an error of law. The Commission properly excluded all oral testimony and written evidence relating to the "tax equivalent." The remaining question to be considered is whether the method approved by the Commission, including as a part thereof the failure to consider the "tax equivalent," resulted in an allocation of rates not just and reasonable.

The City contends that the allocation to public fire protection made by the Commission's decree is unjust, unreasonable, or discriminatory in "end effect." As bearing on this contention the City claims, in addition to the factors already discussed, that the percentage of increase in fire protection was many times that of general service, and that the City

turned over to the District without cost most of the entire existing water system. The District was created by legislative action and under the Charter of the District, approved by the voters of Bangor, the water system became the property of the District. No cases have been cited by the City substantiating its contentions in this respect, and we do not consider them as being necessary factors for consideration by the Commission. The City also sought to present evidence of rates in other communities. This evidence was properly excluded. The general rule is that such evidence is not admissible in the absence of evidence that all, or substantially all, of the physical and economic factors affecting the reasonableness of the rates are similar in both communities. See *Petition of New England Tel. & Tel. Co.*, 66 A. (2nd) 135, 144 (Vt.).

As we have previously stated, the method employed by the Commission in reaching the prescribed rates and its reasons therefor were set forth in its decree with such clarity that it can be tested by judicial review. That method gave proper consideration to the purpose for which the new system was installed without taking into consideration either tax exempt property or the "tax equivalent." The rulings of law by the Commission were correct and its findings were supported by substantial evidence. We cannot say that the method of allocation submitted by the District and approved by the Commission was not just and reasonable, or resulted in any undue or unreasonable preference or advantage to the City or to any user of water, including the United States Government, or that the rates were confiscatory in violation of the due process clauses of the State or Federal Constitution.

The entry will be

*Exceptions overruled.*

## ILLUSTRATION OF APPLICATION OF THE "TAX EQUIVALENT"

|  | Total | Allocation of Totals General Users | Public Fire |
|---|---|---|---|
| Actual Revenue Needs | $475,000 | $385,000 | $ 90,000 |
| "Tax Equivalent" | 60,000 | 45,000 | 15,000 |
| TOTAL | $535,000 | $430,000 | $105,000 |
| Credit "Tax Equivalent" to the City of Bangor |  |  | 60,000 |
| Final Allocation of Actual Revenue Needs | $475,000 | $430,000 | $ 45,000 |