No. 47,697

SHAWNEE HILLS MOBILE HOMES, INC., *Appellee* and *Cross-appellant*, v. RURAL WATER DISTRICT NO. 6, a Corporation, *Appellant* and *Cross-appellee*.

(537 P. 2d 210)

Opinion filed June 14, 1975.

*William Hergenreter,* of Shaw, Hergenreter, Quarnstrom & Wright, of Topeka, argued the cause and was on the brief for the appellant and cross-appellee.

*Jan W. Leuenberger,* of Glenn, Cornish and Leuenberger, of Topeka, argued the cause, and *Henry J. Schulteis,* of the same firm, was with him on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

FONTRON, J.: This litigation erupted over a dispute as to water rates. The plaintiff, Shawnee Hills Mobile Homes, Inc. (sometimes called Mobile Homes herein), operates a mobile home court lying south and west of Topeka and within the boundaries of Rural Water District No. 6. Mobile Homes became unhappy with the rate which applied to it and filed this injunction action. The trial court agreed

that the rate charged Mobile Homes was unreasonable and enjoined the district from collecting the same. District No. 6, feeling aggrieved, brings the present appeal. Mobile Homes has filed a cross-appeal.

A short history is in order. On July 24, 1961, Water District No. 6 (herein referred to as defendant or district) was organized as a quasi-municipal corporation by order of the Board of Shawnee County Commissioners, pursuant to K. S. A. 82a-612, *et seq.*, to which we will refer as the Rural Water District Act or, more simply, as the Act. On the same date Rural Water District No. 7, adjoining District 6 was organized, also pursuant to the Act. To assist them in constructing their individual water systems each district obtained a loan from the Farmers Home Administration (F. H. A.), a government agency administered by the Department of Agriculture, and each district secured its loan by real estate mortgage. At the bidding of F. H. A. the two water districts entered into a contract whereby District 6 agreed to provide water to District 7, which had no independent source of its own, at the rate of 65 cents per 1000 gallons, subject to certain adjustments of no importance here.

Under provisions of K. S. A. 1974 Supp. 82a-619, rural water districts are given authority, among other powers, to sue and be sued, to enter into contracts, to hold real estate and personal property, to construct, install, maintain and operate such ponds, reservoirs, pipelines, pumping installations or other facilities for the storage, transportation or utilization of water as may be necessary to carry out the purposes of its organization, to cooperate with and enter into agreements with the secretary of the United States Department of Agriculture, or his duly authorized representative, to accept such aid as the secretary of agriculture is authorized to give and to acquire loans for financing up to ninety per cent of the original cost of construction projects needed to carry out the purpose for which the district is organized. A district may secure its loan by mortgaging its assets, but may not levy any taxes.

Management of district affairs is vested by the Act in a board of directors, with authority to adopt such rules and regulations, in conformity with the provisions of the Act and the bylaws of the district as are deemed necessary for the conduct of the business of the district. An integral feature of the plan outlined in the Act is the "benefit unit." The statute provides that the total benefits of any improvement shall be divided into a suitable number of benefit units and "each landowner within the district shall subscribe to a

number of such units in proportion to the extent he desires to participate in the benefits of the improvements." Where the capacity of the facilities permit, participating members may subscribe to additional units on payment of the fee for each unit.

Bylaws of District 6, adopted by the landowners as outlined in K. S. A. 1974 Supp. 82a-621, provide that no landowner can become a water subscriber unless he has subscribed and paid for one or more benefit units; that units are considered donations to the district and are not refundable; that they follow title to the land and transfer cannot be made without board approval. A benefit unit entitles the owner to not to exceed one water line to his property, each line to serve not to exceed one residence or business establishment with usual outbuildings. The bylaws authorize the board to fix charges for water services and to establish equal rates for farm members and non-farm members according to the amount of services furnished. Cost of a benefit unit was originally set at $225 but was increased to $450 at the annual district meeting held February 2, 1972.

The rate schedule for individuals was adopted by the board May 2, 1962. Under the schedule, individual users are charged as follows:

$8 per month for up to 3000 gallons,

$1.50 per 1,000 gallons for the next 2,000 gallons, and

$1 per thousand gallons for all over 5,000 gallons.

Subsequently the $8 minimum was broken down into two figures: $6 denominated "debt retirement" and $2 for a minimum of 3,000 gallons. The testimony disclosed that the revenue derived from both charges went into the district's operating fund.

At the time the defendant installed its water system Mr. and Mrs. Donald W. Campbell owned the mobile home court, which then had some fifty residential or living units. On December 18, 1962, the Campbells entered into a written agreement with the district whereby they purchased ten benefit units for the court and it was agreed their water rate would be:

$80 per month for the first 30,000 gallons, and

50 cents per thousand gallons over the minimum.

Washburn Rural High School, which is located within the water district, also purchased ten benefit units, and the rate for this user was fixed at $80 per month for the first 30,000 gallons and $1 per thousand gallons over that minimum.

In 1965 Mr. Dwight Tollefson purchased the Campbells' interest

in Shawnee Hills Mobile Homes, Inc., and the benefit units accruing thereto were transferred to him. Mr. Tollefson continued to receive water at the same rate as had the Campbells until approximately June 1, 1966, when the rate per thousand gallons over the 30,000 minimum was increased, by mutual consent, from 50 cents to $1. This change in rates was approved by Farmers Home Administration. Mr. Tollefson maintains an agreement was made that the increase was to be temporary, and was to continue only until the district was obtaining water for its system from the city of Topeka and was operating at a profit. Mr. Tollefson's testimony was disputed, however, and the disagreement was laid to rest by the trial court's finding that Mobile Homes failed in its proof on this point. There has been no appeal from that finding.

Mobile Homes paid the $1 rate until October 1970, when Mr. Tollefson heard that the district had enjoyed a good year and had made a profit. At that time Tollefson determined to reduce payments to 50 cents per thousand gallons and Mobile Homes has unilaterally been paying at that rate ever since. The reduced payments have not been accepted without protest, however, and the district board has threatened to cut off Mr. Tollefson's water.

This injunction proceeding was commenced in 1971. In addition to seeking injunctive relief on the ground that the rates were arbitrary, unreasonable and capricious, Mobile Homes also prayed judgment for alleged overcharges. February 22, 1973, the petition was amended to enjoin enforcement of a resolution adopted by the district board June 7, 1972, which would have required plaintiff to pay a $6 per month debt retirement charge on each mobile home, instead of on each benefit unit, as had been the case.

It may be said in general that the answer filed by the district traversed the allegations of plaintiff's petition as amended. In addition, the district filed a motion for summary judgment alleging plaintiff had failed to join a contingently necessary party, namely, the United States Government.

The case was tried to the court, which entered a number of findings. Those deemed pertinent to the issues raised in this appeal are summarized: the Farmers Home Administration is not an indispensable or necessary party; the Rural Water District Act (K. S. A. 82a-612, et seq.) is not unconstitutional; plaintiff failed to establish a valid contract made on or about June 1, 1966, providing that plaintiff's water rate in excess of 30,000 gallons would revert to 50 cents per thousand gallons, instead of $1, as soon as the district

was supplied by water from the city of Topeka and was operating profitably; the contract between the district and the Campbells was terminated by the implied consent of the parties; the plaintiff is a business as such term is used in the bylaws and rules of the board; the rate of $1 per thousand gallons charged plaintiff for water used in excess of 30,000 gallons was unreasonable and excessive in that it failed to provide plaintiff with an adequate bulk rate; the board's resolution of June 7, 1972, requiring each mobile home to pay a monthly $6 debt retirement charge constitutes rank discrimination and deprives plaintiff of all savings as a bulk user.

In conclusion the trial court permanently enjoined the district: (1) from requiring Mobile Homes to pay at the rate of $1 per thousand gallons of water in excess of 30,000 gallons, and (2) from enforcing the resolution of June 7, 1972, classifying each trailer as a residential unit requiring a $6 per month debt retirement charge.

In the defendant's statement of points, it is said the trial court erred:

1. In overruling its motion for summary judgment for the reason that an indispensable or contingently necessary party, namely, the United States Government, was not made a party.

2. In finding the district board acted arbitrarily, unreasonably and capriciously in requiring plaintiff to pay $1 per thousand gallons for water in excess of 30,000 gallons and in finding said rate failed to provide an adequate bulk discount, for the reason there was no substantial competent evidence on which to base the findings.

3. In permanently enjoining the district from requiring plaintiff to pay at the rate of $1 per thousand gallons in excess of 30,000 gallons.

4. In denying defendant's claim for attorney fees. This point has not been briefed by the appellant district and has been abandoned.

K. S. A. 1974 Supp 60-219 (a) deals with the joinder of parties and proclaims the law of this state with respect to that subject. The statute provides:

"(a) Persons to be joined if feasible. Whenever a 'contingently necessary' person, as hereafter defined, is subject to service of process, he shall be joined as a party in the action. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

"A person is contingently necessary if (1) complete relief cannot be

accorded in his absence among those already parties, or (2) he claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action in his absence may (*i*) as a practical matter substantially impair or impede his ability to protect that interest or (*ii*) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

In the event a contingently necessary person cannot be made a party, subsection (*b*) outlines the factors to be considered by the court in determining whether or not the action should be dismissed.

The district's argument that the United States government is a necessary party is based on a clause of the mortgage agreement with the Farmers Home Administration in which that federal agency reserves the right to approve or disapprove rates set by the district. The district argues that this stipulation in the mortgage contract clearly vests F. H. A. with an interest in the subject matter of the lawsuit, and that for the court to dispose of this action in the absence of the Federal Home Administration might prejudice either the parties presently before the court, or the absentee federal government.

The Kansas statute on joinder is closely modeled on Federal Rule 19. (7 Wright & Miller, Federal Practice and Procedure: Civil, § 1617.) We are aware that in discussing the applicability of the federal rule to the federal government, the authors of that work have this to say:

". . . When an interest of the federal government is involved in a suit and a judgment cannot be rendered without affecting that interest, the government must be made a party to the action. If that is not feasible, the United States may be regarded as an indispensable party under Rule 19 (*b*) and the action dismissed. . . ." (p. 171.)

We are mindful, also, of federal decisions holding the United States to be an indispensable party where its security interest in property is imperiled by pending litigation. Examples of solicitude for the financial integrity of our national government may be found in *Franz v. East Columbia Basin Irrigation District*, 383 F. 2d 391, and *City of Andarko, Oklahoma v. Caddo Electric Cooperative*, 258 F. Supp. 441. In each of those cases, some portion of the tangible property securing the government's lien was sought to be taken out of and released from the lien, an attempt which, if successful, would have impaired the value of the tangible property securing the lien.

We believe that neither the Wright & Miller citation nor the federal cases to which we have alluded are of controlling force

under the circumstances of this case. We consider those authorities to lay down the rule that when the *res* of the government's security is threatened, the government, or its responsible agent, becomes a necessary or indispensable party. Mobile Homes is not attempting through this action to take any part of the property securing F. H. A.'s loan to District 6; it does not seek to diminish or endanger the *res* which secures the government's lien. The reservation by F. H. A. of the right to approve or disapprove water rates may reflect an interest in regard to rates, but the nature of that interest would appear to us as far less substantial than its interest in seeing that the *res* remained intact. Mr. Morgan Williams, state director of the Farmers Home Administration, testified that after a district has been established, and so long as it is meeting the monthly payments of principal and interest (as the district has been doing here), the agency exercises very little supervision over rates; that the agency has never foreclosed a mortgage given by a water district but if a district lowered its rates without approval "we would probably either post-approve or post-reject the rate."

As we view the relationship between the district and Farmers Home Administration, the interest of the latter in the rates being charged by the former is of such indirect and tenuous nature that we cannot say the United States is an indispensable or contingently necessary party within the purview of K. S. A. 1974 Supp. 60-219 (*a*).

The foregoing conclusion requires us to consider the next two points raised by the district. Taken together, they are, in essence, that the court erred in finding the $1 per thousand gallon rate (over 30,000 gallons) charged Mobile Homes was unreasonable and excessive as applied to a bulk purchaser, and in enjoining collection thereof.

Kansas cases relating to this point are few in number. However, we are not entirely without precedent. District No. 6 is a quasi-municipal corporation (K. S. A. 82a-604) and no claim is made that it is subject to supervision and control by the state corporation commission. Nonetheless, the district is not free to exact whatever rate it sees fit to impose. In *Holton Creamery Co. v. Brown,* 137 Kan. 418, 419, 20 P. 2d 503, this court considered a challenge directed against rates charged by a municipal corporation for water services and there we said:

". . . Such rates must be reasonable; and persons and corporations dependent on these utilities are entitled to judicial protection against *excessive* or *confiscatory* rates. . . ." (Emphasis supplied.)

In the *Holton* case, this court defined the standard by which the reasonableness of municipal water rates are to be gauged. As the court announced, rates must be reasonable in the sense that they are not excessive or confiscatory. It is in this frame of reference that we must judge the circumstances of this case.

It is generally recognized that water rates set by a municipality are presumed to be valid and reasonable until the contrary has been established. (*Usher v. City of Pittsburg*, 196 Kan. 86, 90, 410 P. 2d 419; 94 C. J. S., Waters, § 289a, p. 173) and the burden of overcoming this presumption rests upon the challenging party. In a comparable case of recent vintage, *West Elk Unified School District v. City of Grenola*, 211 Kan. 301, 507 P. 2d 335, the plaintiff challenged sewer service rates charged against it as being arbitrary, capricious and an unlawful usurpation of the legislative power of the municipality. In rejecting the plaintiff's contention, we quoted from our opinion in *Mullins v. City of El Dorado*, 200 Kan. 336, 436 P. 2d 837, where the reasonableness of special assessments levied against real property was in issue:

"'. . . Only if palpable injustice results in applying the method of apportionment and assessment so that the burden imposed is entirely disproportionate to benefits received, will courts, under their equity power, grant relief. . . . The action of municipal authorities in making a special assessment is presumed to be legal, equitable and just, and the assessment is prima facie evidence of the regularity and correctness of all prior proceedings. . . . Thus, in establishing grounds justifying intercession by the courts, a property owner has the burden of proof. . . .'" (p. 304.)

The scope of judicial review of water rates set by a municipality is discussed in some depth by the Iowa Supreme Court in *Knotts v. Nollen*, 206 Iowa 261, 218 N. W. 563. The question was whether the rate or classification given apartment houses by the municipal water plant was discriminatory, inasmuch as apartment houses were classified for rate purposes as residences, with each separately occupied suite or set of rooms being rated as one residence. The apartment owners contended that since special rates were given to owners of other large buildings such as stores, hotels, offices, etc., the denial of wholesale rates to them constituted unlawful and arbitrary discrimination. In finding no discrimination, the court observed:

"Rate-making is a legislative or administrative, not a judicial, function. A rate fixed by the proper administrative authority, while it may be annulled if in violation of legal rights, is not subject to readjustment or correction by the court as a reviewing or supervisory body. When it is found that the rate is not unlawful, the duty and authority of the court cease [sic]. . . . Dis-

crimination, to be unlawful, must be unjust and unreasonable. It must operate to the unjust advantage of one and consequent oppression or disadvantage of another. . . . However, absolute uniformity is impossible of attainment. . . . Classification, within just and reasonable limits, is proper and permissible. The presumption is in favor of the rate and rule established by the rate-making authority. . . . The language of the Supreme Court of the United States, applied to an attack by the utility company upon an established rate, is conversely applicable to an attack by the ratepayer.

" ' "Judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use." ' *San Diego Land & Town Co. v. National City*, 174 U. S. 739. . . ." (pp. 262, 263.)

From 1966 to 1970 Mobile Homes paid for water at the rate of $1 per thousand gallons above a 30,000 gallon minimum. We find nothing in the record that Mobile Homes complained during that period of time that the rate was excessive, oppressive or confiscatory. It was not until Mr. Tollefson was informed in September, 1970, that the district had experienced a good year that he unilaterally reduced payments to 50 cents per 1,000 gallons over the minimum, basing his action on an alleged agreement which the trial court found was not established. No cross-appeal has been taken from this finding.

In support of its charge of unreasonableness, plaintiff primarily relies on the testimony of Harold W. Gerlach, a professional engineer who, according to his own testimony, had never previously developed a water rate. Although he expressed the opinion, or the suggestion as he sometimes put it, that a rate of 80 cents per thousand gallons would be reasonable, his testimony taken as a whole falls short, in our view, of establishing the rate charged plaintiff as being excessive or confiscatory. Basically what he was saying is epitomized, it seems to us, in the following portion of his cross-examination:

"Q. All right. Isn't what you are really telling us that we could reduce this customer's water rate down to 80 cents a thousand, and all other things being equal, we would have enough money to operate and pay off our debt; isn't that really what you are telling us?

"A. I feel that is so, yes.

"Q. And you are making that statement without reference to the fact, whether or not that is a fair and adequate rate for him? You are just simply saying, we will have enough money on hand?

"A. Yes, sir; I made the statement that I felt the thing was a generous rate.

"Q. It's a generous rate to the point that we could sell him (Tr 230b) this water and still operate, isn't that what you are saying?

"A. Yes, sir."

What is a fair and reasonable rate comprehends more than just enough revenue to get by. Sound fiscal practice would seem to dictate that provision be made for future contingencies and that reasonable reserves be set up to provide for the repair, improvement and replacement of the physical plant and facilities comprising a water distribution system. The rule generally followed is that in the absence of statutory restrictions, a municipal corporation which operates a water system has authority to charge such rates as will yield a fair profit, so long as the rate is not disproportionate to the service rendered. (94 C. J. S., Waters, § 289, p. 174; *Pabst Corporation v. Railroad Comm.*, 199 Wis. 536, 227 N. W. 18; see, also, 90 A. L. R. 700, Anno—Municipally Owned Utility-Rates.) This court recognized the principle in *Holton Creamery Co. v. Brown*, supra.

Before leaving the subject of Mr. Gerlach's testimony, the record reflects he failed to consider a number of factors which appear to us would have a bearing on the rate structure. For example, he had no knowledge of the overall cost of operating expenses of the district; he did not know the size of the standpipe or of the pipeline thereto; nor did he know what part of the reserves came from revenues and what from the sale of benefit units. On the other hand he considered the fact, so he testified, that volume sales water contracts frequently have an escape clause permitting interruption of service, although he learned at the trial that no such clause had been in Mobile Homes' contract. Over objection, the witness testified concerning water rates in other water districts, without any showing being made of comparable conditions. For example, he testified as to water rates in Topeka, a metropolitan area inhabited by some 150,000 closely packed souls, as compared to the rural area of District 6 with approximately 263 individual water subscribers. To compare these two districts would seem absurd. The prevailing rule is that evidence of water rates in other communities is not admissible in the absence of evidence that all or substantially all of the physical and economic factors affecting the reasonableness of rates are similar in both communities. (*City of Bangor v. P. U. C., et al.*, 156 Me. 455, 474, 167 A. 2d 6, 17; *New England Tel. & Tel. Co.*, 115 Vt. 494, 507, 66 A. 2d 135, 144.) This

rule would apply also to other evidence relating to rates in neighboring districts, without a showing of similar conditions.

Mobile Homes complains of the profits earned by District 6, contending they demonstrate that the rates it pays are unreasonable. We believe the accusation is not well founded. At time of trial, the district had some $65,000 on hand, a portion of which was in C. D.'s. This represented an accumulation over a period of eight years. During that period of time, some $39,000 was charged to depreciation. The evidence would indicate that renovation of the physical plant was more than due, with mains needing to be enlarged, storage facilities expanded and pressures improved. The record does not bear the construction that excessive reserves are being hoarded; the testimony indicates that plans are at hand to renovate, repair and improve the present facilities with funds of the district now on hand. It is also planned to expand the system with funds from an additional loan of $95,400, for which application has been made. The officers must keep in mind, however, that the district is not a money-making institution and that the accumulation of reserves should bear a relation to district needs.

The trial court found that District 6 failed to provide reasonable bulk rates for users such as plaintiff and that the rate charged Mobile Homes was thereby unreasonable. By "bulk users" we assume was meant those who are volume users of water, consuming more of the life-giving fluid than the average customer. However, the same test must be applied to all users, large and small: Are the rates reasonable—not excessive or confiscatory under attending circumstances? No consumer, regardless of size, should become a victim of discrimination, although we recognize that discrimination may be a relative term and that absolute equality is seldom if ever entirely achieved.

According to Mr. Gerlach, the most important single factor to be taken into account, so far as a reduction in rates would be concerned, is the fact that Mobile Homes maintains its own internal distribution system, without cost to the district except for one meter. So far as that is concerned each subscriber maintains his lines from the meter. Each customer also reads his own meter and computes his own bill without cost to the district. We can understand, however, that some savings would accrue to the district from not having to service multiple meters or extend 100 accounts on its books. On the other hand, the record reflects an increasing chorus

of complaints emanating from Mobile Homes residents which might tend to offset in some degree the economies effected. Finally, it can be said, the rate charged Mobile Homes is somewhat lower than that charged individual users, as a comparison of the two rate schedules will attest.

We have already mentioned that ten benefit units were purchased for one other water consumer, Washburn Rural High School. This would indicate that the high school, too, is a volume consumer. The high school district has paid, apparently, from the beginning, $80 for the first 30,000 gallons of water and $1 per thousand gallons thereafter. The school district has sought no reduction of rates, so far as the record reveals, nor has it complained of discrimination in the matter of rates. A claim of reverse discrimination might be made, were the high school to be charged $1 and Mobile Homes only 50 cents per 1,000 gallons over the minimum.

But the volume of water used by a consumer is not the only gauge by which water schedules are to be measured. In 94 C. J. S., Waters, § 289c, p. 175, we find the rule expressed:

"The quantity of water used by each consumer is not the sole criterion of the reasonableness of the rate; there must also be considered the nature of the use, the benefit obtained therefrom, the number of persons who want the water for such use, and the effect of a certain method of determining prices on the revenues to be obtained by the municipality and on the interests of property holders. . . ."

See, also, *Lewis v. M. & C. C. of Cumberland,* 189 Md. 58, 54 A. 2d 319, in which this rule is expounded.

While the trial court referred to Mobile Homes as constituting a business, water supplied to the mobile home park is not for industrial or business use in the ordinary sense of the term, but strictly for home purposes. Residents of mobile homes consume water just as do residents of other homes. A mobile home park or court does not cater to the transient trade, as does a hotel or a motel; their occupants are established residents, not overnight or transitory guests. Mobile homes, so we understand, are not wheel-borne or motorized, or readily movable; they are stable structures for home occupancy, not for occupancy on the go.

Under facts similar to those here, no discrimination was found to exist in municipal water rates charged to apartment house owners in *Caldwell v. City of Abilene,* 260 S. W. 2d 712 (Tex. Cir. App.). The Texas court upheld the inclusion of apartment houses within a residential classification for rate purposes under which a minimum

charge was made for each family unit within the apartment building. The owners contended the classification was discriminatory because water was furnished hotels, tourist camps, motels and other places where itinerant trade was predominant, under an industrial classification wherein only one minimum charge was made regardless of the number of persons or family units supplied. In the course of its opinion, the court stated:

". '. . The interest and needs of the numerous water users served by a city are such that it is improbable, if not impossible, that any classification or rate basis could be devised which would not in some way discriminate against some of the users. If appellants should prevail in this case, there would be a discrimination against consumers in single unit dwellings. Not every discrimination, however, is condemned, but only a discrimination that is arbitrary and without a reasonable fact basis or justification. The discrimination in this case is not arbitrary. . . ." (p. 715.)

In an action with similar overtones, *Reimer v. City of O'Neill,* 189 Neb. 151, 201 N. W. 2d 706, the court held that charges made to a trailer court for water service were not unreasonable where the individual trailers were classified as individual dwellings for purposes of determining charges.

In *Lewis v. M. & C. C. of Cumberland,* supra, the plaintiff, who owned an apartment house, challenged a city water rate ordinance under which he was required to pay a minimum quarterly service charge for each of his thirteen apartments, even though his building was supplied with but one service line, with water being measured by one meter. In upholding the ordinance, the court observed that the minimum charge "is based on the family as a consumer unit. We think this is not an unreasonable classification." (p. 69.)

In setting the rate charged Mobile Homes at $1 per thousand gallons over a 30,000 gallon minimum, the board has, in practical effect, classified mobile homes as being in the same category for rate purposes as other homes in the district. This does not strike us as being an unreasonable or discriminatory approach, and we believe the trial court was mistaken in concluding otherwise.

The record on appeal indicates the district had appealed from the trial court's finding, as unreasonable, the requirement that Mobile Homes pay a monthly $6 debt retirement charge on each home unit. However, in its brief, the district states it is not appealing from that ruling and we therefore pass it by.

We now turn to plaintiff's cross-appeal which challenges the constitutionality of the Rural Water District Act. Mobile Homes

does not question the legislative grant of power to the county commissioners permitting them to create water districts; it argues the Act is invalid in failing to provide adequate guidelines for the district to follow in conducting its business once its organization has been perfected.

No principle is more firmly embedded in the law than the presumption of validity accorded a legislative enactment. The published reports of this court are well studded with cases supporting the position that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its legality and before it may be stricken down it must clearly appear to violate constitutional requirements. (See *State, ex rel., v. Fadley,* 180 Kan. 652, 659, 308 P. 2d 537; 1 Hatcher's Digest [Rev. Ed.] Constitutional Law, § 16; 3A West's Kansas Digest, Constitutional Law, § 48.)

In 2 McQuillin, Municipal Corporations [1966 Rev. Vol.] § 4.13, pp. 35, 36, is found the following discussion relating to the grant of legislative authority:

"The general doctrine prohibiting the delegation of legislative authority does not preclude the legislature from vesting municipal corporations with certain powers as to matters purely of local concern. The legislature, except in so far as barred by constitutional limitations, may confer on municipal corporations any powers it deems fit. In the eye of the law, the state has all necessary power for the protection of the property, health and comfort of the public, and it may delegate this power to its municipal corporations in such manner as may be deemed desirable for the best interest of the public. . . ."

Decisions of this court have recognized that certain powers applying strictly to matters of local concern may be delegated to municipal bodies. In *State, ex rel., v. City of Topeka,* 176 Kan. 240, 270 P. 2d 270, the court said:

"It appears that while the legislature possesses all the legislative power of the state, it is impracticable for them to exercise that power in minute detail. It is their function to enact general provisions, leaving to those who know their local problems best the right to fill in the details in carrying out the general provisions granted by the legislature." (p. 246.)

Similar language appears in *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 364 P. 2d 71:

". . . It is quite true that in delegating powers the legislature must fix adequate general standards, but in many instances the filling in of details must, in the very nature of things, be left to the local authorities. (Citing cases.)" (p. 620.)

See, also *State, ex rel., v. Urban Renewal Agency of Kansas City,* 179 Kan. 435, 440, 296 P. 2d 656.

In the *Topeka* case the constitutionality of G. S. 1953 Supp. 13-1388 to 1391, inclusive, was challenged. Those statutes contained provisions authorizing cities of the first class to acquire and construct off-street parking facilities. The state argued the standards set out were insufficient to guide the city in the acquisition, construction and operation of the facilities. In rejecting the state's contention this court said the legislature specifically provided for the method of acquiring property; the location and improvement of parking facilities; the condemnation procedure to be followed; when and how title was to vest; the method of determining public need; the procuring and payment of experts; the circumstances under which property may be acquired; the method of financing; and the issuance of bonds and the method of paying same.

Matters left for the determination of the city fathers were:

"(1) Whether the facilities are advisable and are of benefit to the city; (2) the amount of money to be expended therefor and, consequently, the amount of the bonds to be issued; (3) the kind or type of facilities to be established; (4) the rates or fees to be charged for the use thereof, and the method of operation of the facilities, whether through lease or otherwise, and the rules and regulations to be adopted concerning the operation of the facilities; (5) the locations and number of facilities to be established."

The court went on to say:

"It is apparent that the standards set out by the legislature were ample, and any further standards might so restrict every city in its attempted operation as to make compliance therewith inoperative. Matters to be determined by a city are purely local in character, and dependent upon the existing conditions and needs of the respective city. . . ." (p. 247.)

We believe the principle laid down in the foregoing authorities is applicable to the case at hand. The Rural Water District Act contains numerous guidelines to be followed in the establishment of rural water districts and the conduct of its business. Included among the guidelines set up are the steps to be taken in the incorporation of districts; the selection of directors, and their terms of office, and the filling of vacancies; the adoption of bylaws and amendments thereto; the adoption of rules and regulations for conducting the district business; the construction and method of financing district facilities; the attachment of new areas to a district and the detachment of other areas; and the dissolution of districts.

In conclusion, we hold the Act does not contravene constitutional requirements and the trial court was correct in so holding.

For reasons set forth in the opinion the judgment of the court

below is reversed as to the appeal and affirmed on the cross-appeal. The case is remanded with instructions to enter judgment in favor of the defendant both on the appeal and cross-appeal.

FROMME and PRAGER, JJ., not participating.